**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Candace Kallen, et al., | No. CV-25-00074-TUC-RCC |
| Appellants, | **ORDER** |
| v. | |
| United States Trustees Office, | |
| Appellee. | |

Appellants Candace Kallen and My Arizona Lawyers, LLC (collectively "Appellants" or "Firm") appeal from a February 3, 2025 Order from the United States Bankruptcy Court for the District of Arizona ("Bankruptcy Court"). Appellants filed an Opening Brief on May 23, 2025 (Doc. 13), Appellee United States Trustee filed a Response on June 27, 2025 (Doc. 17), and Appellants filed a Reply on July 7, 2025 (Doc. 20). Oral argument was held on December 8, 2025. For the following reasons, the Court will affirm the Bankruptcy Court's February 3, 2025 Order.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Kallen is the sole owner of My Arizona Lawyers. (Doc. 18 at 153.) Appellants' practice covers multiple areas of law, including family, criminal, estate planning, and personal injury. (*Id.*) Appellants' bankruptcy practice is predominantly comprised of Chapter 7 and Chapter 13 cases. (*Id.*) EZLegal, LLC ("EZLegal") is a third-party financing firm owned by Katherine Keisel. (Doc. 13 at 10.) EZLegal lends money for legal fees. (*Id.*)
///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### a. The Fee Sharing Arrangement

The business agreement between Appellants and EZLegal began around April 2021. (Doc. 18 at 154.) EZLegal would finance bankruptcy cases for Appellants' debtor-clients who were unable to pay Appellants' fee. (Doc. 13 at 10.) The parties acknowledge that none of the terms of their business agreement, including the fee sharing arrangement, were in writing. (*See* Doc. 19 at 286.) The fee sharing arrangement had three different iterations, each with slight differences. (Doc. 13 at 11.)

The first iteration of the fee sharing arrangement was implemented from approximately April 2021 to October 2022. (Doc. 19 at 286.) EZLegal advanced 75% of the $3,000 Attorney Flat Fee to the Firm and, in exchange, EZLegal had the "right to collect and retain the full Attorney Flat Fee from such debtor-clients." (*Id.* at 287.) EZLegal also had the option to return defaulted debtor accounts to the Firm. (*Id.*)

The second iteration of the fee sharing arrangement began around October 2022. (*Id.*) This version was a verbal modification where EZLegal paid the Firm 62% of the $3,000 Attorney Flat Fee and, in exchange, EZLegal had the right to collect and retain the full Attorney Flat Fee from debtor-clients. (Doc. 13 at 11.) EZLegal stopped returning defaulted debtor-client accounts. (Doc. 19 at 287.) EZLegal also retained 38% of the Attorney Flat Fee. (*Id.* at 287–88.)

The third iteration of the fee sharing agreement began in March 2023 and continued until the Order to Show Cause ("OSC") was issued (*id.*), after which Kallen terminated the entire business relationship with EZLegal (Doc. 18 at 58). Here, EZLegal and Appellants continued their 62% / 38% fee sharing arrangement. (Doc. 19 at 288.) However, EZLegal began requiring debtor-clients to execute the Promises to Pay form. (*Id.*) This made debtor-clients directly bound to EZLegal for the full amount of the Attorney Flat Fee. (*Id.*) The Promises to Pay stated that debtor-clients were borrowing funds directly from EZLegal, were required to pay the Attorney Flat Fee, and were also obligated to repay the principal balance. (*Id.*)

### b. The Retention Agreements and Promises to Pay

Under the third iteration, there were three documents debtor-clients were required

to sign before retaining Appellants for their services: the Pre- and Post-Petition Retention Agreements and the Promises to Pay. The Pre-Petition Retention Agreement gave debtor-clients two options: (1) to pay $2,500 upfront for filing a bankruptcy petition,  and to retain Appellants for after-filing services; or (2) to pay $3,000 later and the Firm would represent the debtor-client for pre-petition filing and services, but would only continue to assist with after-filing services upon the signing of the Post-Petition Retention Agreement. (Doc. 18 at 25.) The Retention Agreements both stated that any additional work would be at the Appellants' discretion at a rate of $300 per hour, plus $150 per hour for paralegal time. (*Id.* at 25, 28.) Debtor-clients would also have to pay a flat fee of $350 per item for Reaffirmations. (*Id.*) The Retention Agreements also stated that all payments would be made to Appellants, who would then pay the lender, EZLegal. (*Id.* at 29, 33.) The Post-Petition Retention Agreement also stated that debtor-clients would face a 19.99% annual interest rate in the event of a default. (*Id*. at 36.) If the debtor-clients did not sign the Post-Petition Retention Agreement, they could either represent themselves or hire another attorney. (*Id.* at 25, 32.)

Debtor-clients were told that they were required to sign the Promises to Pay for continued post-petition representation. (Doc. 19 at 288.) The Promises to Pay allowed EZLegal to recover the "full amount of the Attorney Flat Fee." (Doc. 13 at 13.) The Promises to Pay provided that the debtor-clients would borrow the funds from EZLegal to cover the $3,000 Attorney Flat Fee. (Doc. 18 at 38.) Debtor-clients were then directly obligated to repay EZLegal the principal balance in 12 monthly installments at 0% interest. (*See* Doc. 18 at 38; *see also* Doc. 19 at 288.) The fee sharing arrangement was not stated in any of the Retention Agreements. (Doc. 19 at 299.) The Promises to Pay also featured an astounding 300% annual interest rate "or the maximum rate allowed by law" in the event of a default. (Doc. 18 at 40.) The Promises to Pay did not disclose that Appellants were accepting $1,860 (62%) in full satisfaction of the Attorney Flat Fee owed or that EZLegal would retain $1,149 (38%) of the $3,000 Attorney Flat Fee. (*See id.*)

    *c.  The Order to Show Cause*

This Appeal arose from a hearing held on December 12, 2023, regarding Kallen's

Attorney Disclosures in one of her debtor-client's petitions. (Doc. 13 at 9.) When asked about whether she communicated with most of her debtor-clients, Kallen tentatively responded that she does regarding the specifics of their cases, but she does not advise them about the content or terms of the Retention Agreements. (Doc. 18 at 12.) She continued that if they had questions, they would have to reach out to outside counsel. (*Id.*) Kallen confirmed that she and "staff in her office" drafted the Retention Agreements (*id.* at 10), that additional work would cost $300 per hour (*id.* at 13–14), that the debtor-clients became directly obligated to EZLegal (*id.* at 14–18), and that there was a high default interest rate of 300% in the Promises to Pay (*id.* at 19). On April 16, 2024, Judge Brenda M. Whinery issued the OSC, which required Appellants to show cause as to why the Bankruptcy Court should not: (1) void all Post-Petition Retention Agreements before it "on the basis that they violate the Bankruptcy Code and the Local Rules for the United States Bankruptcy Court for the District of Arizona"; (2) order the disgorgement of all fees paid pursuant to or otherwise attributable to the Post-Petition Retention Agreements; and/or (3) bar Appellants from practicing before the Bankruptcy Court "given what appear to be extensive violations of the Bankruptcy Code, and given the structure and conflicts of interest inherent to her Firm's financing arrangement with EZ Legal Fees." (*Id.* at 49.) The OSC further established that this would be a "miscellaneous proceeding." (*Id.*)

Appellants responded to the OSC on May 8, 2024. (Doc. 19 at 333.) In it, Appellants noted that they were no longer working with EZLegal or any other third-party lender. (Doc. 18 at 58.) Appellants contended that they received the full $3,000 Attorney Flat Fee directly from EZLegal, with a net of $2,662 after paying the filing fee. (*Id.* at 59.) Appellants did not seek reimbursement for the filing fee. (*Id.*) Appellants continued that they were not privy to the interactions between their debtor-clients and EZLegal, and that they performed all agreed-upon services reasonably and diligently. (*Id.* at 59, 60.) Further, Appellants argued that there was "no contractual agreement between MyAZ and EZLegal," and that they did not intentionally seek to violate the Bankruptcy Code. (*Id.* at 60.)

There were eight hearings in total related to this OSC, four of which will be detailed below. (*See* Doc. 19 at 334, 336–37, 339, 341–44.) Prior to the first hearing, Judge Whinery

issued a similar OSC against another attorney, Ruth Ann Ambs, for her financing arrangements with EZLegal and her referral arrangement with Want a Fresh Start, LLC. (*Id.* at 8, n. 13.) In the first OSC hearing on May 15, 2024, Judge Whinery asked whether Appellants used the referral services of Want a Fresh Start, owned by Daniel Richter, Katherine Kiesel's husband. (Doc. 18 at 65–66.) Appellants' counsel, Randy Nussbaum, indicated that Appellants had no relationship with the entity or Richter. (*Id.*)

  The U.S. Trustee noted two concerns in the hearing. The first was that Kallen had been subject to OSCs in other bankruptcy matters before Judge Daniel P. Collins for not filing motions on behalf of her clients, which included the 38 cases listed in the OSC issued by Judge Whinery. (*Id.* at 69–70.) The second was that many of the debtor-clients had "negative disposable income" and did not "appear to have the ability to make these post-petition payments" that were required under the Post-Petition Retention Agreements. (*Id.* at 70.) The Bankruptcy Court ordered Appellants to disclose all documents related to any financing agreements for cases that were financed by EZLegal between May 15, 2022, to May 15, 2024 ("Lookback Period"). (*Id.* at 72; Doc. 19 at 280.)

  Next, in the June 10, 2024 hearing, Appellants' counsel Nussbaum stated that the fee sharing arrangement was "different than what is disclosed in the pleadings," and that the case lists filed by Appellants contained inconsistencies and discrepancies. (Doc. 18 at 107–08, 144–45.) This was the first instance of misrepresentation to the Bankruptcy Court. There were discrepancies between the case list provided by Appellants and EZLegal's case list. (*Id.* at 145.) There were also gaps of missing cases from May 15 to May 31, 2022, and January 11 to January 17, 2024. (*Id.* at 114.) The parties revealed in this hearing that there was a 62% / 38% fee sharing arrangement between EZLegal and Appellants. (*Id.* at 108, 110.) The parties also confirmed that there were no written versions of this arrangement. (*Id.* at 112–13.) The Bankruptcy Court then ordered Appellants to provide the Retention Agreements for all cases filed within the Lookback Period. (*Id.* at 114.) The Court also imposed interim sanctions, which prohibited Appellants from filing any new Chapter 7 Bankruptcy cases in the District of Arizona, unless (1) Appellants obtained wet signatures; (2) Appellants paid the fee in full prior to the filing of the petition or the Firm financed

without an outside lender; (3) the fees were less than $1,860 per case; and (4) Appellants fully complied with a Stipulated Order signed by Judge Collins. (*Id.* at 147.)

However, the Bankruptcy Court discovered in a July 23, 2024 hearing that two attorneys who were still associated with the Firm had created a new law firm by the name of Atlas Law just three days after the Court imposed its restrictions. (*Id.* at 161, 163–64, 203.) In addition, neither party had supplied the Bankruptcy Court with the necessary documentation, such as a fully amended case list. (*See id.* at 170–71, 203.) The Bankruptcy Court noted that it was not the Court's responsibility to figure out how many cases were within the Lookback period. (*Id.* at 171.) Although EZLegal and the U.S. Trustee had reached a settlement agreement in this miscellaneous proceeding, because of the Bankruptcy Court's concern about compliance, it stated it would not consider any proposed settlements unless the parties filed a certification of compliance with the June 10, 2024 Order. (*Id.* at 168, 203.) The Bankruptcy Court reimposed its original sanction prohibiting Appellants from filing any Chapter 7 Bankruptcy cases. (*Id.* at 204.)

The U.S. Trustee then filed a Motion to Examine Fees Paid, Disgorge Fees, and Impose Sanctions Against Candace Kallen and My Arizona Lawyers, PLLC. (*Id.* at 207.) The U.S. Trustee noted that Appellants had not fully complied with the Court's June 10, 2024 Order: Appellants failed to file an amended case list, the Retention Agreements, or the financing agreements in all cases filed within the Lookback Period. (*Id.* at 209.) The U.S. Trustee argued that Appellants' actions demonstrated that they "did not fully understand the nature of the improprieties at issue." (*Id.* at 217.) For example, the Trustee stated that My Arizona Lawyers disregarded the Bankruptcy Court when two affiliated attorneys left the firm and began litigating bankruptcy cases under the newly formed firm Atlas Law. (*Id.* at 210.) In addition, Appellants failed to disclose the use of a third-party financer and made contradictory representations about the details of their fee sharing arrangement. (*Id.* at 215.) Furthermore the U.S. Trustee noted that it appeared that petitions had never been reviewed by the debtor-clients. (*Id.* at 216–17.) Further, the U.S. Trustee noted that Appellants' filings were often untimely, and that both debtor-clients and bankruptcy trustees had notified the U.S. Trustee of problems with the Firm, including

failing to meet with clients, using nonlegal professionals to provide legal advice, and being consistently late in producing documents. (*Id.* at 220.) The U.S. Trustee requested full disgorgement of fees paid within the Lookback period, penalties under 11 U.S.C. § 526(c)(5)(B), and sanctions under the Bankruptcy Court's inherent powers and authority under 11 U.S.C. § 105. (*Id.*)

Appellants responded, stating that (1) their fee was reasonable; (2) any violations of the Bankruptcy Code, Local Rules, and/or Federal Rules of Bankruptcy Procedure were inadvertent; (3) they would actively work to comply in the future; (4) they worked diligently for their debtor-clients; and (5) the proposed sanctions and remedies would be unduly harsh. (Doc. 19 at 282.)

### d. October 16, 2024 Trial

A one-day trial was held on October 16, 2024. Kallen had become self-represented after attorney Nussbaum had withdrawn. (*Id.* at 340–42.) Before trial, Kallen told Judge Whinery that Richter had filed a lawsuit against the Judge and that Kallen was unsure how the lawsuit would affect the hearings that day. (*Id.* at 9.) "The complaint concerned a *sua sponte* order to show cause Judge Whinery issued against [Ruth Ann Ambs], the financer EZLegal, and Want a Fresh Start." (Doc. 13 at 26.) Judge Whinery responded that "[i]t does not" and that there had been "no motion filed," and "to [her] knowledge, it doesn't [have an] impact on these proceedings today." (Doc. 19 at 9–10.)

In the trial, Kallen was questioned about the nature of the Retention Agreements, and how they contradicted the Promises to Pay and Kallen's prior admissions to the Bankruptcy Court; her continued violations of the Bankruptcy Code and Local Rules; and her noncompliance with both Judge Whinery and Judge Collins' orders. (*See e.g.*, *id.* at 17–18, 20–21, 27–28, 34–42, 44–46, 81–83 100–102.) The Bankruptcy Court took the matter under advisement and had the parties file post-trial briefs before issuing its Order on February 3, 2025. (*Id.* at 283.)

### e. The Bankruptcy Court's February 3, 2025 Order

In its February 3, 2025 Order, the Bankruptcy Court found that Appellants had "engaged in a clear and consistent, years-long pattern and practice of violating material

provisions of the foregoing sections of the Bankruptcy Code and Rules intended to protect consumer debtors, and of violating Arizona's Rules of Professional Conduct," and had consistently lied to the Court. (Doc. 19 at 298–99, 300.) The Bankruptcy Court found that based on consistent misrepresentations, all Retention Agreements "in all EZ Legal Financed Cases, as set forth on the Case List, are void, and that Ms. Kallen and her Firm are liable for all fees and charges paid by such debtors." [1] (*Id.* at 300 (citing 11 U.S.C. §§ 329, 526(c)(1), 526(c)(2)(A), 526(c)(2)(C); Fed. R. Bankr. P. 2016; *In re Park-Helena Corp.*, 63 F.3d 877 (9th Cir. 1995); *In re Basham*, 208 B.R. 926 (9th Cir. BAP 1997*), aff'd sub nom*. *In re Byrne*, 152 F.3d 924 (9th Cir. 1998).) The Bankruptcy Court also found that "full disgorgement of all fees that have been paid by debtors in the EZ Legal Financed Cases" was appropriate. (Doc. 19 at 300.)

In addition to voiding the agreements, the Bankruptcy Court ordered Appellants to disgorge $1,644,566.00 to the Clerk of Court, remove all negative credit notations related to the Retention Agreements from debtor-clients' credit reports; and refrain from filing any future bankruptcy petitions in the District of Arizona for two years. (*See id.* at 302–303.)

## II.    STANDARD OF REVIEW

The district court may review the bankruptcy court's orders. 28 U.S.C. § 158(a)(1). Conclusions of law are reviewed *de novo*, while findings of fact are reviewed under the clearly erroneous standard, meaning there is a "serious thumb on the scale for the bankruptcy court." *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge LLC*, 583 U.S. 387, 394 (2018); *see also SVP Fin. Servs. Partners LLLP v. Sky Fin. Inv. LLC*, 588 B.R. 528, 533 (D. Ariz. 2018), *aff'd sub nom*. *Silverman as Tr. of Stanley C. Silverman Revocable Tr., dated Aug. 6, 2006 v. Birdsell*, 796 F. App'x 935, 937 (9th Cir. 2020). A factual finding is clearly erroneous when the court is "left with the definite and firm conviction that a mistake has been committed[.]" *SVP*, 588 B.R. at 533 (citing *In re Greene*, 583 F.3d 614, 618 (9th Cir. 2009)). Otherwise, "the court must accept the bankruptcy court's findings of fact . . . ." *Id.* The district court must review the evidence

---

[1] The Case List included 39 cases before Judge Whinery and over 800 cases before other judges in the Bankruptcy Court. (Doc. 19 at 300, 304–23.)

on the record in the light most favorable to the prevailing party. *See In re Jake's Granite Supplies LLC*, 442 B.R. 694, 698–99 (D. Ariz. 2010).

The court reviews the award of sanctions for abuse of discretion. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991). The "bankruptcy court abuses its discretion if it bases a decision on an incorrect legal rule, or if its application of the law was illogical, implausible, or without support in inferences that may be drawn from the facts in the record*." In re Avon Townhomes Venture*, No. BAO NC-11-1068-HDOD, 2012 WL 1068770, at *5 (B.A.P. 9th Cir. Mar. 29, 2012), *aff'd*, 575 F. App'x 715, 716 (9th Cir. 2014) (citing *United States v. Hinkson*, 585 F.3d 1247, 1261–63 (9th Cir. 2009)).

## III. DISCUSSION

Appellants assert that the Bankruptcy Court erred because (1) Judge Whinery only had subject matter jurisdiction over the 39 cases before her; (2) it did not have the inherent authority, nor authority under 11 U.S.C. § 105(a), which grants power to the court, to impose sanctions; (3) Appellants did not violate any restrictions on debt relief agencies under 11 U.S.C. § 526(c)(2); (4) the sanctions imposed were excessive; and (5) Judge Whinery should have recused herself under 28 U.S.C. § 455(a). (Doc. 13 at 10.) Each of these arguments are addressed in turn.

### a.  Subject Matter Jurisdiction

"The existence of subject matter jurisdiction is a question of law reviewed *de novo*." *Tesla Motors, Inc. v. Balan*, 134 F.4th 558, 560 (9th Cir. 2025) (quoting *United States. v. Peninsula Commc'ns, Inc.*, 287 F.3d 832, 836 (9th Cir. 2002)). Subject matter jurisdiction means "the court's statutory or constitutional power to adjudicate the case." *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 89 (1998). Subject matter jurisdiction can never be forfeited or waived. *United States v. Cotton*, 535 U.S. 625, 630 (2002).

### i.  28 U.S.C. §§ 1334(b) & 157

The Bankruptcy Court has jurisdiction over "all civil proceedings *arising under* title 11 or *arising in or related to* cases under title 11." 28 U.S.C. §§ 1334(b), 157 (emphasis added). "Proceedings 'arising under' title 11 involve causes of action created or determined by a statutory provision of the [Bankruptcy Code]." *In re Wilshire Courtyard*, 729 F.3d

1279, 1285 (9th Cir. 2013) (citation omitted). "'[R]elated to' jurisdiction, is an exceptionally broad category encompassing virtually any matter either directly or indirectly related to the bankruptcy case." *In re GACN, Inc.*, 555 B.R. 684, 693 (B.A.P. 9th Cir. 2016).

First, the Bankruptcy Court had jurisdiction over this miscellaneous proceeding because it "related to" Appellants' actions in the 887 bankruptcy cases.

ii. <u>28 U.S.C. § 137(a)</u>

The bankruptcy court retains "broad equitable power" to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The business of a court shall be divided among its judges as provided by the rules and orders of the court. 28 U.S.C. § 137(a). Judges, however, often rule, issue orders, or transfer cases between themselves. *See Marshall v. Marshall*, 721 F.3d 1032, 1040 (9th Cir. 2013) ("[J]udges are vested with 'inherent' authority to transfer cases among themselves 'for the expeditious administration of justice.'") (quoting *United States v. Stone*, 411 F.2d 597, 598 (5th Cir. 1969) (per curiam)).

Here, Appellants argue that because Judge Whinery did not transfer all cases involving EZLegal that were not before her to herself, that she lacked the jurisdiction to issue any orders in all but 39 of the 887 cases. (Doc. 13 at 34.) The Court disagrees. First, Appellants misunderstand the Bankruptcy Court's power to transfer cases under § 137(a). It simply describes how cases are divided between judges in the same court. As all 887 cases were bankruptcy cases filed within the District of Arizona, then the Bankruptcy Court has jurisdiction over them. Furthermore, although this matter stemmed from a bankruptcy proceeding already in progress, the Bankruptcy Court—within its § 105(a) powers— initiated this case as a miscellaneous proceeding to review Appellants' misconduct, which spanned multiple cases over a two-year period. While the OSC in this case may have affected the remaining open cases assigned to other judges at the time, it had become its own case. (Doc. 33 at 2.) Judge Whinery noted she had ordered Appellants to file the financing agreements in EZLegal's cases because her colleagues had taken an interest in the miscellaneous proceeding since it included many cases on their dockets. (Doc. 18 at

178.)

Regardless of whether Judge Whinery transferred the cases to her, she had jurisdiction to issue the OSC order and order the filing of the fee sharing arrangements in the bankruptcy cases not before her to carry out the bankruptcy provisions.

### b. Inherent Authority

Appellants argue that the Bankruptcy Court lacked inherent authority to sanction because there was no "intentional misconduct." (Doc. 13 at 23.)

Bankruptcy courts have "inherent authority" to sanction "bad faith" or "willful misconduct." *In re Rainbow Mag., Inc.*, 77 F.3d 278, 284 (9th Cir. 1996). The bankruptcy court's inherent power is "derived wholly from statute." *Id.* To impose sanctions under its inherent authority, the court must make "an explicit finding of bad faith or willful misconduct*.*" *In re Dyer*, 322 F.3d 1178, 1196 (9th Cir. 2003). "A court may levy fee-based sanctions when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, delaying or disrupting litigation, or has taken actions in the litigation for an improper purpose." *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001) (quoting *Chambers*, 501 U.S. at 45–46)). Moreover, a court may impose sanctions through its inherent authority when it finds, "[w]illful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose. . . . [A]n attorney's reckless misstatements of law and fact, when coupled with an improper purpose . . . ." *Id.* at 994.

First, the Bankruptcy Court need only find bad faith or willful misconduct, which it did. (Doc. 19 at 299–300.) The Bankruptcy Court found that Kallen had made statements "that she knew or reasonably should have known to be false and/or misleading" and that "Ms. Kallen and her Firm's position that their inadequate disclosures and violations of the Bankruptcy Code and Federal Bankruptcy Rules were merely inadvertent to be totally disingenuous and self-serving." (*Id.* at 300.)

But regardless, this Court finds Appellants' misconduct was intentional. During each interaction, Appellants continually misrepresented or omitted information related to the details of the fee sharing arrangement between themselves and EZLegal and made

material misrepresentations about the details of the contract terms to their debtor-clients. Therefore, the Bankruptcy Court had the inherent authority to sanction Appellants.

### i. 11 U.S.C. § 105

Next, Appellants argue that because the Bankruptcy Court "did not seek to remedy violations of a specific court orders (instead seeking to remedy alleged violations of bankruptcy rules), sanctions under § 105 were inappropriate." (Doc. 20 at 5.)

There is a difference between the "civil contempt power" 11 U.S.C. § 105(a) and the inherent sanctioning authority. *Dyer*, 322 F.3d at 1196. Section 105(a) "allows a court to remedy a violation of a specific order . . . . The inherent sanction authority allows a bankruptcy court to deter and provide compensation for a broad range of improper litigation tactics." *Id.* (citing *Fink*, 239 F.3d at 992–93).

Appellants argue that the Bankruptcy Court's § 105(a) authority would only apply had they violated a court order. It is clear that Appellants violated the Bankruptcy Court's June 10, 2024 Order when representatives of the Firm opened Atlas Law to continue practicing bankruptcy cases three days after the Order had been put in place, and when Appellants did not provide an amended case list. (*See* Doc. 18 at 161, 163–64, 203.) Further, Appellants continued to violate Judge Collins' stipulated order for failure to appear on behalf of their debtor-clients by not responding to motions. (*See id.* at 69, 124; Doc. 19 at 100–02.)

Even if Appellants had not violated court orders, the language of both statute and caselaw permit courts to sanction to prevent the abuse of process. *See* 11 U.S. § 105(a); *Rainbow*, 77 F.3d at 284. The record shows Appellants continuously left out information and provided multiple misrepresentations regarding the details of the Retention Agreements and the case list. For example, when asked about the financing arrangement between Appellants and EZLegal, Appellants initially told the Bankruptcy Court that the Firm received the $3,000 directly from EZLegal. (Doc. 18 at 59.) The apportionment of the $3,000 Attorney Flat Fee between Appellants and EZLegal was not originally disclosed to the Bankruptcy Court, nor to the debtor-clients. (Doc. 19 at 294.) The Appellants also failed to file supplemental information and certain disclosures either in a timely manner or

in full compliance with the Bankruptcy Court's orders. (*Id.* at 96–99, 294.) In fact, Appellants consistently failed to meet deadlines throughout the proceedings. (*Id.*) Therefore, Appellants' failures and continued disregard for disclosure constituted bad faith, willful misconduct, and abuse of process that allowed Judge Whinery to impose sanctions under 11 U.S.C. § 105(a) for violating a court order.

### c. Legality of the Retention Agreements

Under Local Rule 9010-1(c)(1), an attorney who represents a debtor at the start of their petition must represent the debtor in all matters, other than adversarial proceedings, until their case is closed, or until the attorney requests withdrawal or is substituted.

Here, Appellants argue that the Bankruptcy Court's sanctions were excessive because (1) the Fee Sharing Arrangement was legal and (2) they did not violate 11 U.S.C. § 526(c)(2). (Doc. 13 at 35.)

However, the legality of the agreement is not the issue. The issues here are whether (1) the Retention Agreements were properly within the requirements of the Bankruptcy Code and Local Rule 9010-1(c)(1), and (2) the terms in the Retention Agreements were consistent and properly explained to their clients.

Therefore, the legality argument is moot. The Court addresses the remaining issues.

### d. Bankruptcy Requirements for Fee Agreements

#### 1.  11 U.S.C. § 329

A "debt relief agency" is any person who provides any kind of bankruptcy assistance to an assisted person in exchange for "money or other valuable consideration . . . ." 11 U.S.C. § 101(12A). Any attorney representing a debtor under Chapter 11 must file "a statement of compensation paid or agreed to be paid" with the court. 11 U.S.C. § 329(a). The compensation disclosure includes "the particulars of any fee sharing agreement." Fed. R. Bankr. P. 2016(b)(1). This is done through Bankruptcy Form 2030. *See* https://www.uscourts.gov/forms-rules/forms/disclosure-compensation-attorney-debtor-0 (last visited Feb. 12, 2026).

Here, Bankruptcy Form 2030 falsely stated that Appellants were not sharing their compensation with any other person outside of the firm. (Doc. 18 at 23.) Appellants argue

that § 329 does not apply because it "only makes an attorney liable for excess charges." (Doc. 20 at 7.) Section 329 is not just about excess legal fees. It is the statutory requirement for an attorney to disclose information about the fee paid, or to be paid, for their services. 11 U.S.C. § 329(a). Judge Whinery found that Appellants failed to abide by this rule by not disclosing the fee sharing arrangement, the presence of a third-party lender, or the true source or amount of compensation paid or to be paid, and the record supports it. (Doc. 19 at 299.)

Therefore, Appellants' compensation disclosure violated § 329(a).

### ii.   Federal Rule of Bankruptcy Procedure 2016(b)

Appellants argue that Federal Rule of Bankruptcy 2016(b) is not a sanctions provision. (Doc. 20 at 8.) To impose sanctions for the violation of this rule, Appellants claim the Bankruptcy Court would have to rely on its inherent authority. (*Id.*)

Disclosure is required under Federal Rule of Bankruptcy Procedure 2016(b). Courts have held that an attorney who fails to comply with those requirements "forfeits any rights to compensation." *Basham*, 208 B.R. at 930–31. "Once the bankruptcy court determines that an attorney has violated § 329 and Rule 2016, the bankruptcy court has the authority to order the attorney to disgorge all of his [or her] fees." *Id.* at 31.

Here, as noted earlier, Appellants' Form 2030 was not in compliance with Rule 2016(b). Judge Whinery found that Appellants had violated both § 329 and Rule 2016(b). (Doc. 19 at 299.) Further, the Court has established that the Bankruptcy Court had inherent authority to sanction.

Therefore, Appellants failed to comply Rule 2016(b) and the Bankruptcy Court was well within its authority to request the full disgorgement of the fees.

### iii.   11 U.S.C. § 526(c)(2)

A debt relief agency shall not "make any statement, or counsel or advise any assisted person or prospective assisted person to make a statement in a document filed in a case or proceeding under this title, that is untrue or misleading, or that upon the exercise of reasonable care, should have been known by such agency to be untrue or misleading." 11 U.S.C. § 526(a)(2). A debt relief agency also cannot "misrepresent to any assisted person

- 14 -

or prospective assisted person, directly or indirectly, affirmatively or by material omission, with respect to -- (A) The services such agency will provide to such person; or (B) the benefits and risks that may result if such person becomes a debtor in a case under this title . . . ." *Id.* § 526(a)(3)(A)–(B). A debt relief agency must "execute a written contract" with the assisted person that "explains clearly and conspicuously" "the (1) services being provided and (2) the fees or charges for such services and the terms of payment." *Id.* § 528(a)(1)(A)–(B).

"Any contract for bankruptcy assistance . . . that does not comply with the material requirements of this section . . . or section 528 shall be void and may not be enforced by any Federal or State court or by any other person, other than such assisted person." *Id.* § 526(c)(1). The debt relief agency is liable to the debtor "in the amount of any fees or charges in connection with providing bankruptcy assistance . . . ." *Id.* § 526(c)(2). This includes actual damages, and reasonable attorney's fees if the debt relief agency "is found. . . to have -- (A) intentionally or negligently failed to comply with any provision of this section, [including] section 528 with respect to a case or proceeding . . . ; (C) intentionally or negligently disregarded the material requirements of this title or the Federal Rules of Bankruptcy Procedure . . . ." *Id.* at § 526(c)(2)(A), (C). In addition, if the bankruptcy court, on its own motion or the motion of the U.S. Trustee or the debtor, finds that any attorney violated this section "or engaged in a clear and consistent pattern or practice of violating this section," the bankruptcy court may; "(A) enjoin the violation of such section; or (B) impose an appropriate civil penalty against such person." *Id.* at § 526(c)(5)(A)–(B).

Here, Appellants argue that they are not liable under § 526(c)(2) because they did not intend to make misrepresentations to their clients or to the Bankruptcy Court. (Doc. 13 at 23.) Appellants contend that they were well within the requirements for debt relief agencies because they informed their clients of the charge for their services, the terms of payment, and that the Bankruptcy Court "made no finding that [Appellants] were overzealous attorneys who misrepresented information to the Bankruptcy Court in an effort to obtain bankruptcy relief for their clients, or that [Appellants'] representation harmed the clients." (*Id.* at 37.) Appellants may have informed their debtor-clients about the amount

- 15 -

being charged for the services, but they did not disclose the fee sharing arrangement between Appellants and EZLegal.

The purpose of the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) is to "correct perceived abuses of the bankruptcy system." *Milavetz, Gallop, & Milavetz, P.A. v. U.S.*, 559 U.S. 229, 231 (2010). This includes the regulation of conduct of debt relief agencies. *Id.* at 232. The bankruptcy provisions at issue here were created to allow for full transparency between the debtor and the attorney, as well as transparency between the attorney and the court. Such transparency, logically, includes the disclosure of any shared fee between an attorney and a non-legal entity. Appellants did not "clearly or conspicuously" explain the $3,000 Attorney Flat Fee. Moreover, at no point in the Retention Agreements did they notify the clients of the existence of the fee sharing arrangement between EZLegal and Appellants. (*See* Doc. 18 at 25–30, 32–37.) The Retention Agreements also include material misrepresentations about debtor payment obligations, inconsistent terms that go against Local Rule 9010-1, and are inconsistent with the Promises to Pay. (*See id.* at 33, 34, 38.)

Therefore, Appellants are liable under 11 U.S.C. § 526(c)(2) "in the amount of any fees or charges in connection with providing bankruptcy assistance."

### iv.  11 U.S.C. § 528

A debt relief agency must "execute a written contract" with the assisted person that "explains clearly and conspicuously" "the (1) services being provided and (2) the fees or charges for such services and the terms of payment." 11 U.S.C. § 528(a)(1)(A)–(B). "Any contract for bankruptcy assistance . . . that does not comply with the material requirements of this [section 526] or section 528 shall be void and may not be enforced by any Federal or State court or by any other person, other than such assisted person." *Id.* § 526(c)(1).

Appellants argue that because they followed § 528's requirements for debt relief agencies, they are not liable under the restrictions on debt relief agencies in § 526(c)(2). (Doc. 13 at 37.) As indicated previously, Appellants did not "clearly and conspicuously" disclose the Attorney Fee Arrangement, in violation of § 528. However, even if they had not violated § 528, under § 526(c)(2), any contract may be voided, and the debt relief

agency can be liable if the agency makes a material omission or fails to file the required documents. 11 U.S.C. § 526(c)(2), (a)(2), (a)(3)(A). Appellants prepared skeletal bankruptcy documents that were not properly reviewed by the debtor-clients before filing. (*See* Doc. 19 at 62–63.) This is a direct violation of § 526(a)(2). Therefore, Appellants can be liable "in the amount of any fees or charges in connection with providing bankruptcy assistance" for intentionally violating §526. 11 U.S.C. § 526(c)(2).

Secondly, the record reveals that Appellants misrepresented their required services to their debtor-clients. The Retention Agreements state that any other work necessary for continued representation through their bankruptcy petition would be at Appellants' discretion and would cost $300 extra an hour depending on the services needed, even though they were required to continue that representation under Local Rule 9010-1(c). (Doc. 18 at 34.) While Appellants argue they continued to represent their clients contrary to the language of the Retention Agreements, debtors with no knowledge of the law, let alone the Bankruptcy Code and the Local Rules, would not be able to conclude that such services were required. This is also a direct violation under § 526(a)(3)(A)–(B).

Therefore, even if Appellants conformed with the requirements under § 528, they are still liable under § 526(c)(2) because of their violations under § 526(a)(3)(A).

### e.  Ethical Rule Compliance

Appellants argue that the Bankruptcy Court "erroneously found that My Arizona Lawyers did not affirmatively explain the retention agreements." (Doc. 13 at 15.) Appellants contend that the Retention Agreements "correctly advised" debtor-clients about: (1) the potential conflicts of interest; and (2) the benefit of obtaining independent counsel; and (3) giving them a reasonable opportunity to obtain independent counsel. (Doc. 13 at 38.)

Under Arizona Rules of Professional Conduct 1.8:

(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in

writing in a manner that can be reasonably understood by the client;

      (2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

      (3) the client gives informed consent in a writing signed by the client to the essential terms of the transaction and the lawyer's role in the transaction including whether the lawyer is representing the client in the transaction[.]

. . . .

      (f) A lawyer shall not accept compensation for representing a client from one other than the client unless:

      (1) the client gives informed consent;

      (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and

      (3) information relating to representation of a client is protected as required by ER 1.6.

ER 1.8.

The ethical rules specifically state that agreements must contain terms that are fair and reasonable and must be fully disclosed in a way that is easy for the client to understand and allows the client to give their informed consent. The Court finds they did not. Informed consent "denotes the agreement by a person to a proposed course of conduct after the lawyer *has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct*." *United States v. Lacey*, No. CR-18-00422-001-PHX-SPL, 2018 WL 4953275, at *4 (D. Ariz. Oct. 12, 2018) (quoting E.R. 1.0(e)) (emphasis added).

Here, Kallen stated that she did not take the time to adequately explain the terms of the contract with her debtor-clients, specifically the details of the business relationship between the Firm and EZLegal. (Doc. 18 at 18; Doc. 19 at 48.) She merely stated that if they had questions, they could ask her or obtain independent counsel. (Doc. 18 at 18; Doc. 19 at 52.) Further, the Retention Agreements contained material misrepresentations regarding payment obligations, inconsistent provisions when compared to the Promises to Pay, and numerous improper conflicts of interest waivers. (Doc. 18 at 29–30; *see* Doc. 19 at 291–92.)

Although it is well within the Ethical Rules to inform potential clients of the benefit of obtaining independent counsel, this suggestion is rendered meaningless because Appellants' debtor-clients were not in the position to be able to afford both her services or the services of another attorney to review the Retention Agreements and the Promises to Pay. Furthermore, the debtor-clients lacked the informed consent needed to knowingly agree because, as Appellants have admitted, they did not take the time to properly inform and explain to the debtors the details of the business relationship, nor the potential conflicts that could arise. As noted by the Bankruptcy Court, "To expect debtor-clients, who are unsophisticated in the law, to understand documents which are complex, inconsistent, contradictory, and overreaching, and which include numerous direct conflicts of interest waivers is not only outrageous but in direct violation of E.R. 1.8 of the Arizona Rules of Professional Conduct." (Doc. 19 at 299.)

### f. Sanctions Disproportionate with Findings of Fault

The court has "discretion to review newly presented issues on appeal if (1) there are 'exceptional circumstances' why the issue was not raised in the trial court, (2) the new issue arises while the appeal is pending because of a change in the law, or (3) the issue presented is purely one of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue in the trial court." *Avon,* 2012 WL 1068770, at *10 (citing *Rhoades v. Henry*, 598 F.3d 495, 501 n.7 (9th Cir. 2010)).

Appellants argue that even if sanctions were appropriate, the sanctions imposed were not proportionate with the findings of fault. (Doc. 13 at 40.) Appellants contend that when sanctioning under its inherent powers, the Bankruptcy Court "must impose the least restrictive sanctions that would be effective." (*Id.* (citing 5 Fed. Proc. L. Ed. § 9:459.)) Appellants argue that the Bankruptcy Court should have chosen less restrictive sanctions. (*Id.* at 41–42.)

Appellants had the opportunity to make this argument in their post-trial briefs. They did not. (*See* Doc. 19 at 263–276.) Further, they have made no argument that there is the existence of some exceptional circumstance that prevented them from including this argument before this appeal, that the law has recently changed, or that the opposing party

suffers no prejudice with this newly raised argument. Therefore, the Court will not review this portion of Appellants' argument.

### g.   Recusal of Judge Whinery

Any judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). A judge must seek disqualification if:

> (1) [s]he has personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; . . . (5) the judge or their spouse, or a person with the third degree of that relationship of them, or the spouse of such person; (i) is a party to the proceeding, or an officer, director, or trustee of a party; (ii) is acting as a lawyer in the proceeding; (iii) is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; or (iv) is to the judge's knowledge likely to be a material witness in the proceeding.

*Id.*

The test for whether a judge is impartial is "whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *McCray v. Ryan*, 389 F. Supp. 3d 663, 665 (9th Cir. 2019) (quoting *United States v. Nelson*, 718 F.3d 315, 321 (9th Cir. 1983)). In other words, would a reasonable person "perceive a significant risk that the judge will resolve the case on a basis other than the merits." *Id.* at 666 (citing *In re Mason*, 916 F.2d 384, 385 (7th Cir. 1990)). A reasonable person means a "well-informed, thoughtful observer, not a 'hypersensitive or unduly suspicious person.'" *Id.* (quoting *Clemens v. U.S. Dist. Ct. for Cent. Dist. of Calif.*, 428 F.3d 1175, 1178 (9th Cir. 2005)).  Because there is always "*some risk*" of impartiality, the risk must be "substantially out of the ordinary." *Id.* (citing *Mason*, 916 F.2d at 383) (emphasis in original).

A judge need not recuse simply because a litigant filed, or threatens to file, a lawsuit against a judge. *United States v. Sutcliffe*, 505 F.3d 944, 958 (9th Cir. 2007). A judge also need not recuse himself without a "factual connection or relationship" between the case before them and a "previous investigation into the defendant that began during the judge's tenure as the United States Attorney." *United States v. Hunt*, 153 F.4th 858, 864 (9th Cir.

2025) (quoting *United States v. Silver*, 345 F.3d 1075, 1079 (9th Cir. 2001)).

Here, Appellants argue that Judge Whinery was improperly acting as "complaining witness, prosecutor, judge, jury and executioner." (Doc. 13 at 48 (quoting *Matter of Johnson*, 921 F.2d 585, 586–87 (5th Cir. 1991).)  Appellants also claim that because Daniel Richter is married to the owner of EZLegal, Katherine Kiesel, he is a party to this case. (*Id.*) In addition, Appellants claim Richter's lawsuit against Judge Whinery was enough to require her to recusal. (*Id.*) Appellants conclude that Judge Whinery was biased because while acting in her capacity as the United States Trustee, she was heavily involved, and played a key role in, Richter's disbarment. However, the Court finds that Judge Whinery was well within her authority to continue as judge in this matter.

First, Richter was never a party to this case. While he was a party to the Ruth Ann Ambs matter, it was in his capacity as owner of Want a Fresh Start and its referral services. (Doc. 18 at 65.) Kallen concluded that she had not used the referral services of Want a Fresh Start, nor had she done any form of business with Richter. (*Id.* at 65–66.) Richter's position as the husband of Ms. Keisel does not make him a party to this case. Neither he nor his LLC were named in the miscellaneous proceeding at issue here or were required to respond to any inquiries regarding Appellants' agreements with EZLegal.

Second, the lawsuit against Judge Whinery was filed in Maricopa County just five days before the October 16, 2024 trial. (Doc. 19 at 328, 344.) Richter sued Judge Whinery after she issued an OSC "regarding the concerns the [Bankruptcy C]ourt had pertaining to the disclosures of attorney compensation and agreements, as well as, Ms. Ambs' disclosed relationship with Fresh Start indicating that Fresh Start referred clients to her Firm, drafted Firm agreements, and provided financing to the Firm." (Doc. 30 at 4; *see* Doc. 13 at 26.) The lawsuit was dismissed with prejudice for failure to state a claim on May 23, 2025. (Doc. 19 at 330.)  It is clear from the timing of the filing of that suit that it was the direct result of an unsatisfactory outcome in the Ruth Ann Ambs case and filed for the sole purpose of removing Judge Whinery from the instant matter.

Finally, Judge Whinery acted as the United States Trustee until June 25, 2002 and Richter was not disbarred until 2011. (Doc. 17 at 37.) Further, the U.S. Trustee's Office

was not involved in Richter's disbarment. (*Id.*) Appellants offer no other evidence showing that Judge Whinery had any involvement in Richter's disbarment, save for his lawsuit that was filed against her. (*See* Doc. 13 at 47.) Based on the record, the Court finds that Judge Whinery did not have any significant involvement with Richter's disbarment. Regardless, Richter's disbarment was not the subject of this case.

To the extent Appellants are arguing that Judge Whinery should have recused herself based on 28 U.S.C. § 455(b)(5), they have made no factual allegations or legal argument related to this subsection. Appellants have not shown that Judge Whinery's impartiality should be reasonably questioned. Therefore, Judge Whinery was not required to recuse herself for this matter.

## IV.    CONCLUSION

For the foregoing reasons, **IT IS ORDERED:**

1)  Appellants' Appeal is **DENIED** (Doc. 1) and the Bankruptcy Court's February 3, 2025 Order is **AFFIRMED**.

2)  Appellants' Motion to Stay is **DENIED AS MOOT**. (Doc. 22.)

3)  The Clerk of Court shall docket accordingly and close the case file in this matter.

Dated this 13th day of February, 2026.

Honorable Raner C. Collins
Senior United States District Judge